UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

─────

TRAVIS MICHAEL UNDERWOOD, #413128,

|  |  |
|---|---|
| Petitioner, | Case No. 1:08-cv-642 |
| v. | Honorable Paul L. Maloney |
| MARY BERGHUIS, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

_____/

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a mandatory sentence of life without parole on a conviction for first-degree murder, MICH. COMP. LAWS § 750.316.  The Montcalm County Circuit Court imposed this sentence on November 10, 2005, after petitioner was convicted by jury trial.  Petitioner appealed his conviction to the Michigan Court of Appeals, which affirmed conviction with an unpublished *per curiam* opinion issued July 24, 2007.  The Michigan Supreme Court denied leave to appeal on November 29, 2007.

Petitioner initiated the present habeas corpus proceeding by filing a *pro se* petition on July 8, 2008.  Petitioner filed an amended petition on August 11, 2008. His petition raises six grounds for habeas corpus review:

I.    Petitioner's convictions should be overturned because there was insufficient credible evidence at trial to prove him guilty of the crimes.

II.   Petitioner's convictions must be reversed because they are against the great weight of the evidence, and there was a miscarriage of justice.

     III.     The Michigan Court of Appeals erred in stating that the trial court did not deny Petitioner a fair trial and his due process rights by allowing in co-defendant's statements which violated his constitutional right to confrontation; instruction errors; evidentiary rulings; and not granting an adjournment for an out of state witness; and for taking no independent actions regarding the prosecutor's errors, and in failing to grant Petitioner's motions for a directed verdict and a new trial.

     IV.     Petitioner should get a new trial because of ineffective assistance of trial counsel.

     V.     Petitioner is entitled to a new trial because of newly discovered evidence.

     VI.     The prosecutor's actions denied Petitioner a fair trial and his due process rights under the Federal and Michigan Constitutions.

Respondent has filed an answer, supported by the state trial and appellate records.

This matter has been referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Upon review, I find that petitioner's second and fifth grounds are pure state-law claims not cognizable in habeas corpus. I further find that petitioner's first, third, fourth, and sixth grounds for habeas corpus relief should be denied on their merits. I therefore recommend that the petition be denied.

**Proposed Findings of Fact**

**A.**    **Trial Court Proceedings**

This prosecution arose from the murder of a 73-year-old woman named Kathryn Dyer in Edmore, Michigan, on April 26, 2001. On that night, Dyer, a petite, frail woman with serious arthritis (Trial Transcript (TT) I, 152-54), attended a church service between 7:00 p.m. and 9:15 p.m. (*Id*. at 143). Sometime between 9:15 p.m. and 9:30 p.m., Dyer left her church and, as was her custom, drove an elderly woman named Mary Sherland back to Sherland's residence. Dyer then departed. (*Id*. at 138). Dyer's body was found in her home the next day.

Also on the night of the 26th, petitioner and two of his cousins, brothers Anthony and Aaron Chapman, attended a party, and left around 7:00 p.m. (TT III, 236). They returned around 11:30 p.m. (*Id*.). Petitioner was observed crying and overheard repeating "I didn't know." (*Id*. at 226). The Chapmans became agitated by this behavior and demanded petitioner "shut up" and told him "this is what crybabies do." (*Id*. at 229). The three eventually departed with their girlfriends between 11:30 p.m. and midnight. (*Id*. at 236).

Sometime after 12:30 a.m. on the morning of April 27, 2001, a woman named Joyce Mangus was awakened by the approach of a car in the driveway of her Edmore home. (TT IV, 6-7). Upon investigation, she found four "kids" who wanted to speak with her husband, Bill Mangus. (*Id*. at 7). Bill Mangus, now deceased, returned to Joyce after conferring with the visitors and told her the kids were looking for Anthony and Aaron's cousin, Kyle Chapman, who was known to live on occasion in a camper outside the Mangus' house. (*Id*. at 6-7). Bill Mangus told them he had not seen Kyle Chapman and did not know where he was, that "he's like the wind, he comes and goes," and told them they would have to leave. (*Id*. at 7). Later that morning, petitioner and the Chapman brothers arrived at Kyle Chapman's house, driving a dark-colored Pontiac Grand Prix. (*Id*. at 63). Kyle Chapman reported that the three were high and drunk, and accompanied by a man Kyle identified as Rodney Cobb. (*Id*.). Anthony was holding the handle of a "busted pipe wrench." (*Id*. at 67). Aaron Chapman told his cousin Kyle that they had done "something bad" (*Id*. at 99) and solicited his help in disposing of the car, which Aaron said was stolen. (*Id*. at 64). Originally, the group wanted Kyle's help in cutting the car into pieces, but Kyle refused on the grounds that such a process was too labor intensive. (*Id*. at 99). Motivated by a sense of family loyalty and the belief that the crime committed was only the theft of a car (*Id*. at 93), Kyle Chapman agreed to drive behind

-3-

the Grand Prix and pick up the four men when they had disposed of the vehicle.  (*Id*. at 67-68).  The group departed sometime after Kyle Chapman dropped his son off at school and stopped to acquire a five-gallon can of gas.  (*Id*. at 68, 84).  Chapman followed his cousins as they drove out, lost them briefly, and, upon finding them, gave them the gas can.  (*Id*. at 68).  They set out again, headed towards M-46.  (*Id*. at 69).  Again, Kyle Chapman fell behind.  (*Id*. at 71).  Chapman drove to a gravel pit outside Vestaburg, Michigan, and waited an hour or more for the others to double back and find him.  (*Id*. at 92).

Meanwhile, Charles House, a student returning from school because of illness, and his mother, Dion House, noticed a suspicious car sitting by the basketball courts near House's high school on A Avenue and Third Street, in downtown Vestaburg, Michigan, around 8 a.m.  (TT II, 221, 240).  The car was dark-colored with distinctive pinstripes (*Id*. at 228), and was later identified as being similar to or the same as the one owned by Kathryn Dyer.  (*Id*. at 229).  Dion House saw at least two people in the car.  (*Id*. 241).  Dion House advised the school principal of the suspicious vehicle and, at his request, informed the police.  (*Id*. at 240).  In investigating the matter, the police discovered that Charles House saw the face of one man clearly enough to relate to a police sketch artist.  (*Id*. at 223).  That picture was later confirmed by multiple parties as being an accurate depiction of petitioner.  Cassandra Davis, a Vestaburg resident, observed the black car, which she identified as a dark-colored Grand Prix, parked across the street from her house around 7:30 a.m. and considered it to be suspicious.  (*Id*. at 254-55).  Davis testified that the car was still sitting in place when she left her house around 11:00 a.m.  (*Id*. at 256).  She saw three people in the vehicle.  (*Id*. at 258).  Delores Stack, a local, also noticed the car as she walked by with her children, around 10:00 a.m.  (*Id*. at 266), and saw at least two men inside, occupying the front seats.  (*Id*.).

That same morning, Dyer's daughter, Karel Eastmen, grew concerned when her mother failed to answer the phone. Eastmen called her brother, Kenneth Dyer, and asked him to check on her. (TT I, 151). Kenneth Dyer complied, and, upon reaching his mother's home, observed that her car, a black Pontiac Grand Prix with distinctive pinstripes, was missing. (*Id*. at 191). A habitual early-morning walker named Sallie Compson later testified that Dyer's car was missing when she walked by on her customary route at 5:00 a.m. on the 27th (*Id*. at 270-71), and that all the lights in the house were on. (*Id*. at 276-77). Upon entering the building, Kenneth Dyer discovered his mother's body lying on the floor, with her Bible by her side and blood around her head. (*Id*. at 197). Police and medical personnel dispatched to the scene confirmed that Dyer was dead. (*Id*. at 227). Investigation of the house revealed that, aside from the body and a broken window in the back of the house (TT II, 10), the condition of Dyer's home was immaculate and without notable sign of disruption. (*Id*.).

At an unidentified time before noon on the 27th (TT III, 26), a group of Kathryn Dyer's fellow parishioners traveling north and east of Vestaburg recognized Dyer's car as it drove by. (*Id*. at 26, 31). They had yet to learn of Dyer's death. (*Id*. at 26, 30). One of the women, Lilly Strom, saw a man in the driver's seat. (*Id*. at 32). Linda Allbee, previously married to petitioner's uncle (*Id*. at 38), saw a car consistent with the one owned by Kathryn Dyer. (*Id*. at 37). The car drove past her home on Vestaburg Road, outside Vestaburg, while she watered trees in her front lawn. (*Id*. at 38). She observed three occupants in the car, and recognized petitioner as they drove by, at high speed. (*Id*. at 38-39). The car was heading for Douglas Road. (*Id*. at 39-40).

At some point, petitioner and the Chapmans found Kyle Chapman waiting for them at the gravel pit outside Vestaburg. (TT IV, 72). Kyle began to follow his cousins again, and

eventually doubled back after passing the stolen car in a field. At this point, the car was on fire. (*Id*. at 72-73). Kyle met the burning vehicle's former occupants, now on foot, and allowed them to climb into the truck. (*Id*. at 73). Kyle then proceeded to drive the four passengers to a variety of destinations, at their request. (*Id*. at 73-74). Kyle Chapman maintained throughout the trial that there was a fourth man with petitioner and the Chapman brothers, and that the fourth man was Rodney Cobb (*Id.* at 66), despite the existence of physical evidence suggesting that Rodney Cobb lived and was working in Texas on that day. (*Id*. at 49-50).

A man named David Powell, Jr., traveling with his family that day, observed smoke. Traveling towards the source, Powell found a car in a field off of Vestaburg Road, fully engulfed in flames. (TT III, 94). Powell called in the fire around noon (*Id.* at 97). Shortly after 2:00 p.m., Officer Michael Williams arrived on the scene and used his dual purpose police dog, canine Xill, to track footprints leading away from the smoking car to Douglas Road, where the trail disappeared. (*Id*. at 11-12). Subsequent investigation of the car confirmed that the licence plate matched that of Kathryn Dyer. (*Id.* at 117-18). Multiple liquid accelerant patterns were found on floorboard areas, and the Michigan State Police concluded that the fire was started intentionally with the aid of accelerants. (*Id.* at 111, 123). Inside the car, the remains of broken eyeglasses, a key, a key ring and scissors were found. (*Id*. at 112).

Forensic examination of Kathryn Dyer's body revealed significant trauma, specifically eleven to twenty injuries to the head (TT II, 59-60) consistent with wounds caused by blows from blunt objects. (*Id*. at 63). Dyer had bruising on her right shoulder, hand and wrist suggestive of defensive wounds. (*Id.* at 60-61). She also had throat injuries characteristic of manual strangulation. (*Id*. at 65). All injuries occurred while Dyer was alive. (*Id*. at 66). The prescription pain killer

-6-

hydrocodone was found in Dyer's blood in prescription strength at the time of her death.  (*Id*. at 69, 88).  No viable physical evidence was found at the crime scene.  No usable fingerprints were found (*Id*. at 132-33), no DNA at the scene matched the defendants' (*Id*. at 200-01), and after the remove of several years, none of the footprints discovered outside Dyer's home could be matched to petitioner's footwear.  (*Id*. at 153-154).

Suspects began to emerge in the case after the police sketch made from high school student Charles House's description of the man in the dark car was published in the Greenville Daily News.  (TT IV, 44).  Petitioner's name began to appear in connection to the sketch by the end of May, though the police did not believe they had enough information to approach him until February, 2002.  (*Id*. at 45).  By then, too much time had elapsed to compare any of petitioner's footwear to the prints outside of Dyer's house.  (*Id*. at 46).  Charles House originally believed the man he identified might be Gordon Shively, who resembled petitioner.  (TT II, 225-26).  House later identified him as petitioner (*Id*. at 222), who briefly dated his sister.  (*Id*. at 224).  When approached by the police, Linda Allbee disclosed that she was 99% certain that the man she saw in the car, similar to the victim's, driving towards the area where Dyer's car was burned was petitioner, Travis Underwood.  (*Id*. at 37, 46).  The police proceeded to accumulate testimony gleaned from friends and acquaintances of petitioner.

Petitioner and the Chapmans were not conservative in connecting themselves with the crime.  On April 26, 2001, the night of Kathryn Dyer's death, Regina Partington was at the party where petitioner and the Chapmans had departed and returned in a state of agitation.  She witnessed petitioner weeping and chanting "I didn't know," and the Chapmans' efforts to silence him.  (TT III, 229).  Partington understood that, wherever they went, a car was taken (*Id*. at 230), but she believed

that petitioner merely waited in the car (*Id*.), or was "supposed to make sure there were no problems." (*Id.* at 234).

Joey Lee Wagoner learned of the murder from schoolmate and friend Anthony Chapman. (TT III, 73). Chapman told Wagoner that he "and Travis" broke into a house looking for prescription drugs. (*Id*. at 76). When they got caught by a lady (*Id*. at 75), Travis hit her "quite a few times." (*Id.* at 77). Wagoner mentioned that they took a car and eventually burned it. (*Id*.). Chapman told him she had a book with her. (*Id*.). In a second conversation held one or two months later, Chapman mentioned that the book was a Bible. (*Id*. at 78-79). Wagoner linked the "Travis" in the story to Travis Underwood through the police sketch publicized in the media. (*Id*. at 80).

Hollie Smith, a friend of petitioner, was drinking with him when he started crying and began saying "I didn't do it," and recounted how a murder was committed in his presence, but not by him. (TT III, 127-28).

Emme Scheidt was a relation of Kathryn Dyer's through her uncle's marriage. (TT III, 139). Scheidt confronted petitioner after his name began to be mentioned in connection with the murder and asked him if he was involved. (*Id*. at 139). Petitioner neither confirmed nor denied his involvement, but told Scheidt to keep her mouth shut and mind her own business. (*Id*. at 141).

Donny Crater was petitioner's roommate at the time of the murder. Petitioner told him he went to rob "a place," that "a lady" came home, and that he "got scared and hit her." (TT III, 162). Petitioner also told him that he and his accomplices took a car and set it on fire. (*Id*. at 165). Petitioner asked Crater to act as an alibi witness for him, but Crater refused, and advised petitioner to turn himself in. (*Id*. at 166).

-8-

Petitioner asked Melinda Husley, an on-again off-again girlfriend, if the police artist's sketch in the news resembled him. (TT III, 189). Husley confirmed that it did. (*Id.*). Husley also said that, after petitioner's confrontation with Emme Scheidt, he confessed that he hit "her (Scheidt's) grandma" with a wrench. (*Id.* at 192). Husley testified that he told her he went to the victim's house looking for drugs (*Id.*) after Anthony and Aaron Chapman learned Dyer was getting prescription painkillers at a doctor's office. (*Id.* at 190). Kenneth Dyer had taken his mother to the hospital two days before her death because of heart discomfort, where he believed she had been prescribed "something." (TT I, 193). Husley testified that over the course of several conversations, petitioner initially denied his involvement but finally confessed, and that she tried to talk him into turning himself in. (TT III, 195).

After his arrest, Anthony Chapman told Andrew Mason, a fellow inmate, that he and Aaron broke into a lady's house, stole various objects, stole her car and went "baha-ing" with it before they set it on fire. (TT III, 206). Anthony elaborated that the car was a four-door Grand Am and that he and his brother gained access to the house through a window. (*Id.*).

Further testimony was provided by Billy Jake Orman, an inmate incarcerated with Underwood. Orman, upon seeing the police sketch in the paper, repeatedly asked petitioner "what that was all about" until petitioner admitted that he and two friends broke into a house intent on theft when an old lady came home and "they went and started beating on her." (TT III, 216-17). Orman further stated that petitioner said they meant to knock her out, but when she died, they took her car and wound up burning it, to destroy the evidence. (*Id.* at 217).

Jaimie Cox, an ex-girlfriend of Anthony Chapman, testified that Anthony referred to the murder as a means to intimidate her. At the end of their relationship, Anthony Chapman returned

for his belongings and told Cox "I'll beat you bitch, just like we did that old lady." (TT III, 240). He also informed her that the bludgeon used was a lead pipe. (*Id*.)

Kim Lumbert, an ex-girlfriend of Anthony Chapman, lived with him for a year and discussed Dyer's murder on several occasions. (TT 242-43). Anthony Chapman named Aaron Chapman and Underwood as his companions in breaking into Dyer's house, admitted that they were looking for pills, were scared when Dyer returned, and killed her. (*Id*. at 243). Anthony claimed that petitioner was the one who beat Dyer. (*Id*.). Chapman also said that "the bitch died with a Bible in her hands" (*Id*. at 245), and that they stole and burned Dyer's car "so they wouldn't get caught." (*Id*. at 246-47). When Lumbert first learned the police were questioning Jaimie Cox about Chapman's involvement in the murder, her questions provoked Chapman, who pushed her against a wall and threatened her life if she "talked." (*Id*. at 244).

Margaret Russo, a self-described personal friend of Anthony Chapman, also had multiple conversations with Anthony on the subject of the murder, and testified that he specifically mentioned his brother Aaron and petitioner, using petitioner's full name. (TT III, 253). Russo was told that the three went to Dyer's house looking for Oxycontin, having learned of her prescription at a local physician's office. (*Id*. at 253-54). The three were surprised by Dyer's return, and Travis hit her over the head with a pipe wrench. (*Id*. at 254). In a subsequent conversation, Chapman revealed that they stole Dyer's car and burned it. (*Id*. at 255). Chapman also told Russo that Dyer was returning from Bible study and died with a Bible in her hand. (*Id*. at 256).

Linda Sadler, Margaret Russo's mother, was present during a second conversation between her daughter and Anthony Chapman. (TT III, 264). Chapman implicated himself and Travis Underwood during the conversation, and boasted that they took the car to a field to burn it

-10-

because they couldn't sell it.  (*Id*. at 264-65).  Anthony Chapman told her a pipe was used as the murder weapon.  (*Id*. at 265).  Chapman reiterated his claims that he and his accomplices were looking for pills they had heard Dyer possessed when Dyer surprised them (*Id*.), and that Dyer died with a Bible in her hand.  (*Id*. at 267).

Brandon Devers, another inmate incarcerated with the Chapmans, was told several versions of the story by Aaron Chapman.  (TT III, 275).  In consistent part, Devers learned that the Chapmans and petitioner were the perpetrators, and that the three were in search of prescription drugs when Dyer returned and surprised them.  (*Id*. at 275-76).  Aaron claimed he restrained Dyer, while petitioner struck her.  (*Id.* at 276).  Devers also stated that he was told that Aaron and petitioner cleaned up the scene after the murder to conceal any physical evidence of their involvement while Anthony fetched the car (*Id*. at 276-77), and that they wore gloves throughout. (*Id.* at 277).

Amber Woodrow was an ex-girlfriend of one of Aaron Chapman's friends.  Woodrow testified that at times Aaron Chapman, drunk and high, as was his custom when visiting (TT III, 285), would make comments that he had killed "the old lady in Edmore."  (*Id*.).  Chapman also mentioned petitioner's involvement.  (*Id*.).

Nicole Hernandez, another ex-girlfriend of petitioner, stated that at times, when drunk, petitioner confessed to being scared and that he didn't know what he had gotten himself into. (TT IV, 16).

Brenda Dickman, the mother of petitioner's child, was told by petitioner after the birth of their child that he was involved with an unspecified robbery.  (TT IV, 22-23).

-11-

Kyle Chapman, when originally approached by the authorities, did not give the police a full account of what he knew. (TT IV, 99). That changed when he was subsequently offered full immunity for his role as an accomplice in the crime. (*Id*. at 61). At that point, Kyle Chapman provided the details of how he aided petitioner and the Chapmans in disposing of Dyer's car, as described above. At trial, counsel for the defense raised the possibility that Kyle told Joyce Mangus that he lied about petitioner's involvement during the Chapman brothers' trial, where his testimony was substantively similar. (*Id*. at 92). Kyle Chapman denied having done so. (*Id*.). Defense declined to raise this issue with Joyce Mangus when she was on the stand for the prosecution, or to call her back as a witness for the defense. Chapman also denied admitting his direct involvement in the murder when threatening Tonya Totten. (*Id*. at 97).

Petitioner was charged with first-degree premeditated murder and first-degree felony murder (premised upon second degree home invasion and larceny in a building). Jury trial began in the Montcalm County Circuit Court on September 12, 2005, and continued through September 19, 2005. At the conclusion of the trial, the jury was also instructed on the elements of the charge of unlawfully driving away an automobile (UDAA). The jury found petitioner guilty on all counts. (TT VI, 4). Petitioner was sentenced on November 10, 2005. The court sentenced him to mandatory life without parole on the merged count of the alternate theories of first-degree murder and a concurrent sentence of 3-to-5 years on the charge of UDAA. (docket # 25, Sentencing Transcript (ST), 5-6). The sentences for second-degree home invasion and larceny in a building were vacated. (*Id*.).

B.      **Appellate Proceedings**

Petitioner, through counsel, appealed as of right to the Michigan Court of Appeals.
During the pendency of the appeal, petitioner's counsel filed with the Montcalm County Circuit
Court a motion for a new trial, which the circuit court denied in an order dated January 3, 2007.
Appellate counsel raised the same six claims for relief as are contained in the habeas corpus petition:

I.      Petitioner's convictions should be overturned because there was insufficient credible
        evidence at trial to prove him guilty of the crimes.

II.     Defendant's convictions must be reversed because they are against the great weight
        of the evidence, and there was a miscarriage of justice.

III.    The trial court erred denied Defendant a fair trial and his due process rights by
        allowing in co-defendant's statements which violated his constitutional right to
        confrontation; instruction errors; evidentiary rulings; and not granting an
        adjournment for an out of state witness; and for taking no independent actions
        regarding the prosecutor's errors, and in failing to grant Defendant's motions for a
        directed verdict and a new trial.

IV.     Defendant should get a new trial because of ineffective assistance of trial counsel.

V.      Defendant is entitled to a new trial because of newly discovered evidence.

VI.     The prosecutor's actions denied Defendant a fair trial and his due process rights
        under the Federal and Michigan Constitutions.

(Statement of Questions Presented, Defendant-Appellant's Brief at xviii-xix, found in Michigan
Court of Appeals record, docket # 40).

By *per curiam* unpublished decision issued July 24, 2007, the Michigan Court of
Appeals affirmed petitioner's sentence of life without parole, but vacated petitioner's UDAA
conviction and sentence, and remanded it to the trial court for correction of judgment of sentence.
(7/24/07 Opinion (Op.), docket # 40).

On the sufficiency of evidence claim, the court determined that there was no merit to petitioner's assertion that there was no physical evidence or credible eyewitness testimony implicating him to the murder, nor to the claim that there was insufficient evidence establishing the "premeditated and deliberate" elements of the murder. (Op., 3). The court concluded that, reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that the three perpetrators murdered Kathryn Dyer. (*Id*. at 5). The court held that the prosecution introduced ample evidence that the perpetrators eradicated physical evidence by cleaning the crime scene and burning the victim's car, and there remained sufficient circumstantial evidence and reasonable inferences derived from the evidence for a jury to make a reasoned decision. (*Id*. at 3). The court acknowledged that inconsistences existed in the witnesses' testimony, but noted that issues of credibility were questions to be decided by the jury and that there existed no grounds to disturb the jury verdict. (*Id*.). On the issue of premeditation and deliberation, the court held that the evidence of Dyer's physical injuries and the culprits' actions to eliminate physical evidence was sufficient for a reasonable jury to find evidence of premeditation and deliberation. (*Id*. at 4). The court went on to hold that the evidence was sufficient to support a conviction on the alternative theory of first-degree felony murder, for which proof of deliberation and premeditation are not necessary. (*Id*. at 4-5). The court therefore found no merit to the insufficiency of evidence claim. This finding also invalidated petitioner's claim that the trial court erred in denying his motion for a directed verdict and his motion for a retrial. (*Id*. at 5).

With regard to the claim that the convictions were against the great weight of evidence, the court found that the preponderance of evidence did not weigh against the verdict, such that it would be a miscarriage of justice to allow the verdict to stand. (*Id.* at 5).

Addressing petitioner's claims under the Confrontation Clause and hearsay rule arising from admission of statements made by the Chapmans, the court noted that the Chapmans' statements fell under the hearsay exception of MRE 804(b)(3) as admissions against penal interest. The Chapmans repeatedly implicated themselves in the murder against their penal interests, and they therefore would not have made the statements unless they were true.  (Op., 6).  With regard to the Confrontation Clause challenge, the court applied the Michigan Supreme Court's test enunciated in *People v. Poole*, 506 N.W.2d 505 (Mich. 1993), under which an out-of-court statement is admissible over a Confrontation Clause objection if the declarant is unavailable and the statement otherwise bears sufficient evidence of reliability.  The court found that the Chapmans' statements were admissible under this test, and therefore believed it unnecessary to address the prosecution's contention that the statements were non-testimonial under the Supreme Court's decisions in *Davis v. Washington*, 547 U.S. 813 (2006), and *Crawford v. Washington*, 541 U.S. 36 (2004) (Op., 6-7).[1]

The court found no hint of impropriety with the trial court's denial of petitioner's request to instruct the jury on manslaughter, noting that the instruction was not warranted.  Medical evidence indicated that the murder was intentional and petitioner produced no evidence of provocation.  (Op., 8).

---

[1] This analysis of the Confrontation Clause issue was patently incorrect.  The *Poole* decision was an application of the then-governing Supreme Court case *Ohio v. Roberts*, 448 U.S. 56 (1980), under which an unavailable witness's testimony was deemed admissible over a Confrontation Clause objection if it bore sufficient indices of reliability.  *Crawford* overruled *Roberts* and held that out-of-court *testimonial* statements are barred by the Confrontation Clause, unless the defendant had a chance to cross-examine the declarant, regardless of the statement's reliability.  541 U.S. at 61-69. The Court of Appeals should have reached the *Crawford* issue; any discussion of reliability was irrelevant to Confrontation Clause analysis after March 8, 2004.

The court next held that there was no error on the part of the trial court in denying a motion for dismissal predicated upon an alleged violation of the 180-day rule. The delay in bringing petitioner to trial was largely based on his own requests for a period of 120 days for discovery and not the fault of the prosecution, which made a good-faith effort to bring petitioner to trial expediciously. (*Id*. at 10).

The court also concluded that petitioner's claim of ineffective counsel was without merit. Petitioner's claim relied on counsel's failure to call two witnesses, Joyce Mangus and Tonya Totten, to impeach Kyle Chapman's testimony. (Op., 10). Joyce Mangus did indeed testify as a prosecution witness, and was cross-examined by defense counsel. The court found that the decision not to recall Joyce Mangus was a strategic decision and fell within the reasonable range of professional assistance. (*Id*. at 10-11). The decision not to call Tonya Totten, who was available to give testimony, was irrelevant as there is nothing on the record to establish the substance of her testimony. Petitioner therefore failed to prove that Totten's testimony would materially alter the outcome. (*Id*. at 11). In sum, the court held that petitioner failed to overcome the strong presumption that his counsel pursued sound strategy.

The court also held that the trial court did not abuse its discretion in denying a motion for a new trial on the basis of newly discovered evidence. (Op., 11). The evidence was a police report in which Wayne Forrester said that Kyle Chapman had admitted to him that Chapman had been untruthful about petitioner's involvement in the murder. The court observed that the police report was available before trial and that petitioner should have discovered this evidence through the exercise of reasonable diligence. (Op., 12). Furthermore, there was no indication the evidence made

a new result probable on retrial. (*Id*.). Finally, as the purpose of the evidence was merely to impeach a witness, it would, as a rule, be considered merely cumulative. (*Id*. at 11).

Next, the court rejected petitioner's theory that the trial court abused its discretion in admitting photographs of the victim's body. (*Id.* at 12). The court observed that the photographs were more probative than prejudicial, as they were employed clinically and were relevant to the ability of Dyer's killer to take a second look at his actions, thus establishing premeditation and deliberation. (*Id*.).

The court also rejected petitioner's claim that the trial court erred in failing to grant an adjournment before trial so petitioner could produce an out of state witness, Rodney Cobb (a/k/a. Rodney Stork). (Op., 13). The court observed that petitioner neither established he had made diligent efforts to produce Rodney Cobb in a timely fashion, nor did he establish that the evidence Cobb would produce would be material. (*Id*.).

The court, reviewing an unpreserved issue for plain error, also concluded there was no issue of prosecutorial misconduct. (Op., 13). Specifically, the prosecutor did not improperly elicit sympathy during his opening statement. (*Id*.). Nor did the prosecutor argue facts not in evidence during his closing statement. (*Id*. at 14). The court noted that the record shows that the allegedly questionable prosecutorial statements either reflected facts in evidence or were reasonable inferences flowing from the evidence. (*Id*. at 14).

Finally, the court reviewed the claim that the trial court erred in giving instructions for second-degree home invasion (MICH. COMP. LAWS § 750.110a(3)), larceny in a building (MICH. COMP. LAWS § 750.360), and unlawfully driving away an automobile (UDAA) (MICH. COMP. LAWS § 750.413), and that the court further erred in allowing the conviction based on these instructions

-17-

to stand. (Op., 14). This claim was based upon the allegation that petitioner did not receive adequate notice of these charges and that convictions stemming from them violated his due process rights. (*Id*.). This challenge was unpreserved, but reviewed for plain error. The court concluded that petitioner's argument regarding the charge of second-degree home invasion and larceny in a building failed, as he was fully appraised that these counts were the basis of his felony murder charge. (*Id*. at 15). However, the court found that petitioner was never apprised of the charge of UDAA before his conviction. (*Id*. at 16). Petitioner was prejudiced by unfair surprise and an inability to defend himself against the UDAA charge, and the court ordered that conviction and sentence vacated on remand. (*Id*.).

Petitioner filed a *pro se* application for leave to appeal to the Michigan Supreme Court. By standard order entered November 29, 2007, the court denied discretionary review. (11/29/07 Order, docket # 41). This habeas corpus action followed.

## Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); see *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations."

-18-

*Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 180 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.")(quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94. The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington v. Richter*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Berghis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the

"unreasonable application" clause if that state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should apply or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).

## Discussion

### I.    Sufficiency of the Evidence

Petitioner's first habeas corpus claim alleges that the evidence was insufficient to convict him for premeditated murder. A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson v. Virginia*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

-20-

The Michigan Court of Appeals ruled directly on this claim, which petitioner's counsel raised on appeal. Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008); *Thompson v. Bock*, 215 F. App'x 431, 435 (6th Cir. 2007). Effectively, such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia*. *See Eady v. Morgan*, 515 F.3d 587, 596 (6th Cir. 2008). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson v. Bock*, 215 F. App'x at 436. This standard presents a "very difficult hurdle" for the habeas petitioner. *Id*. at 437.

The Sixth Circuit recently summarized the "double layer of deference" given the state-court decisions in the context of sufficiency-of-the-evidence claims:

> Thus, after AEDPA, federal courts reviewing state habeas claims accord a double layer of deference:
>
> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state*

*appellate court's* sufficiency determination as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

*White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

In this case, petitioner maintains that a lack of physical evidence and questions of credibility concerning prosecutorial witnesses render the evidence insufficient to implicate him in the crimes for which he was convicted. Petitioner also alleges the evidence is insufficient to establish the elements of premeditation and deliberation necessary to prove first-degree murder. The Michigan Court of Appeals applied the appropriate constitutional standard, namely examining whether the evidence, when viewed in a light most favorable to the prosecution, would justify a rational trier of fact finding that all the elements of the crimes were proven beyond a reasonable doubt.

The record contains a dearth of physical evidence directly linking petitioner to the crime. However, the state Court of Appeals noted that the prosecution produced testimony that petitioner and his accomplices took significant steps to destroy any such evidence. The court accurately observed that circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of the elements of the crime of premeditated murder. *People v. Jolly*, 502 N.W.2d 177, 180 (Mich. 1993); *People v. Marsack*, 586 N.W.2d 234, 237 (Mich. Ct. App. 1998). The lack of physical evidence, standing alone, does not create grounds to invalidate a state conviction, which may be based on circumstantial evidence alone. *See Rodriguez v. Roberts*, 371 F. App'x 971, 975 (10th Cir. 2010) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)).

-22-

Petitioner also calls into question the sufficiency of evidence on the ground that the credibility of the prosecution's witnesses was undermined by inconsistencies in their testimony.  The appellate court noted that the prosecution may rely on circumstantial evidence, and in so doing, its burden is to "convince a reasonable jury 'in the face of whatever contradictory evidence the defendant may provide.'"  *People v. Hardiman*, 646 N.W.2d 158, 162 (Mich. 2002) (quoting *People v. Konrad*, 536 N.W.2d 517, 522 n.6 (Mich. 1995)).   The federal Constitution imposes no greater burden on the prosecution.  *See Jackson v. Virginia*, 443 U.S. at 326 (a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution).  Any factual conflicts are to be observed in the light most favorable to the prosecution.  *People v. Fletcher*, 679 N.W.2d 127, 145 (Mich. Ct. App. 2004).  The credibility of the witnesses was a matter for the jury to decide and is not an appropriate subject for habeas review.  *Herrera*, 506 U.S. at 401-02; *Brown v. Kontech*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1081 (2010).  The only issue is whether the jury could reasonably infer from the evidence that petitioner committed the crime of conviction.  *See White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 130 (2010).

The state appellate court also considered petitioner's challenge to the sufficiency of evidence proving the premeditation and deliberation elements of first-degree murder.  Petitioner predicates this claim on a lack of evidence that he set out to commit murder, and points to testimony that he and his accomplices were surprised while robbing the house as indicative of voluntary manslaughter rather than first-degree murder.  (Petitioner's Brief, docket # 2, ID # 60).  In order to establish first-degree murder, the prosecution must establish the elements of premeditation and

deliberation. *People v. Marsack*, 586 N.W.2d at 237; *People v. Bowman*, 656 N.W.2d 835, 841 (Mich. Ct. App. 2002). Premeditation and deliberation require sufficient time between the intent and the act for the defendant to take a second look to reconsider his or her actions before killing. *People v. Abraham*, 599 N.W.2d 736, 745 (Mich. Ct. App. 1999). Premeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident, including the previous relationship between the defendant and the victim, the defendant's actions before and after the crime, and the circumstances of the killing. *Id.*; *People v. Haywood*, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995). The nature of injuries, such as manual strangulation or the presence of defensive wounds, while not sufficient in and of themselves, can be suggestive evidence that defendant had an opportunity to take a "second look." *People v. Johnson*, 597 N.W.2d 73, 79 (Mich. 1999). Proof of motive is not essential. *People v. Abraham*, 599 N.W.2d at 745 (citing *People v. Wells*, 302 N.W.2d 196, 200 (Mich. Ct. App. 1980)).

As the state Court of Appeals noted, the lack of physical evidence is explicable. The prosecutor produced testimony that petitioner and his accomplices took care to clean Dyer's house after the murder (TT III, 276-77) and burned Dyer's car (*Id.* at 77, 217, 246, 255, 264-65) to destroy any tangible evidence. Regardless, the circumstantial evidence is overwhelming. Petitioner and his accomplices admitted their involvement in the crime, in whole or in part, to at least eleven witnesses. (*Id.* at 73,125, 162, 189, 206, 217, 240, 243, 253, 263, 275, 285). Another witness observed petitioner and the Chapmans in a state of distress when they returned to a party on the night of the murder. (*Id.* at 226). Petitioner was seen in a car matching Dyer's shortly before it was destroyed, near the area it was subsequently found. (TT II, 222; TT III, 38). Petitioner was linked both to the car and the conflagration by eyewitness and accomplice Kyle Chapman. (TT IV, 64, 72-73). That

-24-

petitioner and his confederates were searching for Kyle Chapman on the night of the murder was corroborated by Joyce Mangus.  (*Id*. at 6-7).  The prosecution likewise produced ample medical evidence which not only established that the cause of death was homicide (TT II, 71), but also that the culprits had sufficient opportunity to take a "second look" at their actions, including evidence that the victim received eleven to twenty blows to the head.  (TT II, 60).  Certainly, in the course of administering twenty blows to a victim's head, an assailant would have ample time, and reason, to stop and reconsider.  Given the weight of this testimony, a jury could reasonably have concluded petitioner was indeed involved in the death of Kathryn Dyer and that the murder involved premeditation and deliberation.  The Court of Appeals correctly relied on *Marsak* in approving the use of circumstantial evidence and reasonable inferences arising from the evidence to reach this conclusion.  (Op., 3).

Under any standard of review, the decision of the state Court of Appeals passes muster.  The court applied the correct constitutional standard, correctly identified the elements of the offense as enunciated by the state Supreme Court, and reasonably applied the facts of the case. The findings of the Court of Appeals were supported by reasonable inferences from witness testimony concerning petitioner's involvement in the crime, the nature of the victim's injuries, and the lengths to which petitioner went to destroy evidence.  The decision of the state Court of Appeals was a reasonable application of the *Jackson v. Virginia* standard.  Petitioner's first claim for relief is therefore without merit.[2]

---

[2] As noted by the state Court of Appeals, the jury found petitioner guilty of first-degree murder on the alternative theory of felony-murder.  Under Michigan law, felony murder is any murder committed in the perpetration of certain enumerated felonies. MICH. COMP. LAWS § 750.316. A conviction for first-degree, felony murder does not require proof of premeditation or deliberation.

## II.      Convictions Against the Great Weight of Evidence

Petitioner's second ground for relief is that his convictions were against the great weight of evidence and so constitute a miscarriage of justice.  On direct appeal, the Michigan Court of Appeals reviewed this claim and considered whether the defendant managed to "establish that an innocent person had been found guilty, or that the evidence preponderates heavily against the verdict so that it would be a miscarriage of justice to permit the verdict to stand."  *People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998) .  The court held that petitioner had not met his burden of proof, and that the prosecution presented sufficient evidence to support his convictions.  (Op., 5).

In making a "weight of the evidence" argument, petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a).  The Michigan courts apply the great-weight-of-the-evidence standard to determine whether to grant a new trial.  *See People v. Lemmon*, 576 N.W.2d at 137.  This question is distinct from the due process guarantee offended by insufficient evidence and "does not implicate issues of a constitutional magnitude."  *Id.* at 133.  Thus, this claim raises an issue of state law, for which habeas review is not available.  Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Freeman v. Trombley*, 744 F. Supp. 2d 697, 728 (E.D. Mich. 2010) (habeas court has no

---

Rather, common-law malice suffices.  *See People v. Dykhouse*, 345 N.W.2d 150, 151 n.2 (Mich. 1984); *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980).  Therefore, even if the evidence of premeditation and deliberation were insufficient, the first-degree murder conviction would stand.

power to grant relief on the basis that the verdict was against the weight of the evidence). Petitioner's second claim fails to establish any basis for habeas corpus relief.

### III.    Due Process Errors

In his third claim, petitioner asserts that the state Court of Appeals erred in not finding that the trial court abused its discretion with regard to a number of issues. These are the same issues raised on direct appeal. The state Court of Appeals rejected each claim.

### A.    Confrontation Clause Claim

Petitioner asserts that the trial court erroneously admitted the out-of-court statements of Anthony and Aaron Chapman, in violation of the state evidence rules and the Confrontation Clause of the Sixth Amendment. On direct review, the state Court of Appeals rejected the evidentiary challenges on state-law grounds. Petitioner's claim that admission of his accomplices' statements violated the state hearsay rules, MICH. R. EVID. 801-804, or that the statements were more prejudicial than probative, MICH. R. EVID.403, frame issues of state law that are not reviewable in habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. at 67-68.

The Court of Appeals rejected petitioner's Confrontation Clause claim on the ground that the declarants were unavailable and that their statements bore sufficient indicia of reliability. This analysis was clearly improper, as it was based on the Confrontation Clause test enunciated in *Ohio v. Roberts*, 448 U.S. 56 (1980), which was abrogated in 2004 by *Crawford v. Washington*, 541 U.S. 36 (2004). The state Court of Appeals noted *Crawford* and its progeny (Op. at 7) but inexplicably found it unnecessary to apply this controlling Supreme Court authority. As the state

-27-

Court of Appeals expressly declined to address petitioner's Confrontation Clause claim under the governing constitutional standard (Op., 7), its decision on this issue is not entitled to deference under AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 406 (2000). Review of the Confrontation Clause issue in this court is therefore *de novo*.

The governing Confrontation Clause test was established by *Crawford*, under which testimonial statements from out-of-court witnesses are admissible only when the witness is unavailable and when the defendant has previously had the opportunity to cross-examine. *Crawford*, 541 U.S. at 59. To come within the scope of the Confrontation Clause, the Chapmans' statements must have been testimonial in nature. Although the standard is not yet clearly defined, the Supreme Court has articulated a test which states that "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Davis v. Washington*, 547 U.S. 813, 824 (2006) (quoting *Crawford*, 542 U.S. at 51). The Sixth Circuit's formulation of the standard asks whether the declarant intends to bear witness against the accused. *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). "That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the case." *Id.*; *accord Miller v. Stovall*, 608 F.3d 913, 923-24 (6th Cir. 2010).

It is difficult to see, nor does petitioner make an effort to prove, how the Chapmans' various statements were testimonial in nature. The statements were not made to figures of authority, nor were they the result of police interrogation, nor were they made in manners which were solemnly meant to establish or prove facts. Simply put, none of these statements could be considered testimonial. *See Davis*, 547 U.S. at 824. The statements were made to a collection of close

associates, friends, girlfriends, and fellow inmates in the course of casual conversation, or, in the

case of Jaimie Cox, during a threatening encounter. No reasonable person would anticipate that

these statements would be used in court or in the police investigation. *See United States v. Johnson*,

581 F.3d 320, 325 (6th Cir. 2009) (out-of-court statements made to close friends, undercover

officers, and confidential informants not testimonial). Where the out-of-court statement is not

testimonial, the Confrontation Clause simply does not apply. *Wharton v. Bockting*, 549 U.S. 406,

420 (2007). Therefore the admission of these statements did not violate petitioner's Sixth

Amendment right to confront witnesses against him.

B.      Instructional Error I: Failure to Instruct on Manslaughter

Petitioner next posits that the trial court improperly instructed the jury, specifically

that "[t]he Court did not instruct on manslaughter although the defense made a request for the same."

(Petitioner's Brief, docket # 2, ID # 81). The state Court of Appeals held that such an instruction

was improper because petitioner failed to present any testimony or evidence to support his theory

that a petite geriatric with severe arthritis could "surprise" three grown men in such a manner as to

provoke voluntary manslaughter. (Op., 8). Therefore, petitioner failed to establish that a rational

view of the evidence supported the instruction. (*Id.*).

Petitioner cannot possibly overturn his conviction on the basis of the absence of an

instruction concerning manslaughter. First, by reason of AEDPA, 28 U.S.C. § 2254(d)(1), a habeas

corpus petitioner must ground his claim for relief on clearly established federal law as determined

by the Supreme Court of the United States. *See Premo v. Moore*, 131 S. Ct. at 743; *Renico v. Lett*,

130 S. Ct. at 1865-66. Under this standard, the lower court must apply the "holdings" as opposed

-29-

to the "dicta" of Supreme Court decisions as of the time of the relevant state-court decision. *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010) ("A legal principle is 'clearly established' within the meaning of [section 2254(d)(1)] only when it is embodied in the holding of this Court."). Petitioner fails this test completely. His brief fails to cite a single decision of the United States Supreme Court that suggests, let alone holds, that the federal Constitution is offended by the failure to instruct on a lesser offense. In fact, the law is to the contrary -- "the Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases." *Dansby v. Trombley*, 369 F. App'x 657, 660 (6th Cir. 2010); *see Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002). Petitioner's challenge to the jury instruction therefore fails at the first step of analysis under AEDPA.

Moreover, petitioner cannot show that the denial of the manslaughter instruction was erroneous, let alone that it so infected the fairness of his trial as to violate due process. As the state Court of Appeals noted, Michigan law allows a court to deny an instruction on manslaughter when the petitioner has established no credible interpretation of the evidence to support it. (Op., 8). Under Michigan law, a killing constitutes voluntary manslaughter if it is caused by adequate provocation. *See People v. Tierney*, 703 N.W.2d 204, 222-23 (Mich. Ct. App. 2005). To be adequate, the provocation must be sufficient to cause a reasonable person to lose control. *People v. Sullivan*, 586 N.W.2d 578, 582 (Mich. Ct. App. 1998). The appellate court pointed to evidence in the record which, if believed by the jury, showed that petitioner and his accomplices bludgeoned Kathryn Dyer a minimum of eleven times and then proceeded to strangle her. *Id.* The record is devoid of any evidence of provocation adequate to induce this response. The idea that such an act could ever constitute voluntary manslaughter is inarguable.

-30-

Petitioner's claim fails to establish any basis for habeas corpus relief.

C.      "Instructional Error" II: Inadequate Notice

In addition to the lack of instruction on manslaughter, petitioner also raises unpreserved claims regarding the instructions for larceny in a building and second-degree home invasion. Additionally, petitioner maintains that the trial court erred in allowing the jury's verdicts on these charges to stand. Petitioner constructs this claim on the allegation that these charges were not included on the original information against him and unmentioned at the beginning of trial. Petitioner maintains that these unanticipated instructions violated his due-process rights on the assertion that he did not receive fair notice of these charges. The fact that contemporaneous objections were not raised at trial, leaving this issue unpreserved, is raised in petitioner's subsequent claim of ineffective assistance of counsel.

Examining this claim for plain error, the state Court of Appeals observed that the charge of UDAA, also at issue on appeal, was added to an amended felony information only after the jury conviction, and created prejudice sufficient to warrant a claim of inadequate notice. (Op., 15). Petitioner was found to be unfairly apprised of the UDAA charge, and the court vacated the conviction and sentence on that count. As to the other felonies, the court correctly observed that petitioner's felony information charged felony murder on the basis of two specified underlying felonies -- second-degree home invasion and larceny in a building. (*Id.*). Therefore, petitioner was specifically apprised of the existence of the home invasion and larceny charges, which the prosecution had the burden of proving in order to establish felony murder. Thus, petitioner was

-31-

informed of these charges and there was no violation of his Fourteenth Amendment right to fair notice.

Respondent has raised the defense of procedural default.  Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of a state conviction, unless the habeas petitioner can show cause for the procedural default and prejudice attributable thereto.  *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Harrington v. Richter*, 131 S. Ct. at 787.  Both the Supreme Court and the Sixth Circuit have indicated, however, that the district court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008).  In the present case, petitioner's purported due-process claim is indisputably meritless, so analysis of the complicated procedural default issue is unnecessary.

Here, there can be no doubt that the Michigan Court of Appeals ruled correctly.  The court noted that the felony Information clearly informed petitioner that the felony-murder charge alleged a killing during the perpetration of second-degree home invasion or larceny.  (Op., 15).  Petitioner's brief acknowledges as much when he concedes that the above charges "were mentioned in count 2 (as enumerated felonies raising murder to first degree)."  (Petitioner's Brief, docket # 2, ID # 84).  Petitioner offers only the unelaborated assurance that he did not have adequate notice he would have to defend himself against these charges.  (*Id*.).  Petitioner's subjective argument is insufficient, in light of the plain words of the Information.  However, even assuming *arguendo* that this claim possessed any merit, it would still be irrelevant.  The Due Process Clause of the

Fourteenth Amendment prohibits the states from depriving any person of life, liberty, or property without due process of law.  Any proceeding that deprives a person of a recognized liberty or property interest must accord the person, at minimum, adequate notice and an opportunity to be heard. *See Peralta v. Heights Med. Ctr., Inc.,* 485 U.S. 80, 84 (1988).  In determining the particular procedural safeguards that are due a person in a specific situation, the courts examine the seriousness of the liberty interest involved and the legitimate institutional needs of the state.  *See Wolff v. McDonnell,* 418 U.S. 539, 560 (1974).  Here there is no liberty interest involved.  The trial court ordered the sentences for both second-degree home invasion and larceny in a building vacated.  (ST, 5-6).  Petitioner has never spent nor will ever spend a day incarcerated for his conviction on the charges of larceny or home invasion.  Petitioner is serving his sentence for the murder of Kathryn Dyer.

### D.   Violation of the 180-Day Rule

Petitioner next alleges that the trial court erred in failing to grant a dismissal based on an alleged violation of the 180-day rule, MICH. COMP. LAWS § 780.131(1).  The state Court of Appeals reviewed this claim and found it meritless, as the prosecution made a good-faith effort to bring petitioner to trial within 180 days.  The failure to bring petitioner to trial expeditiously resulted from petitioner's request for 120 days of discovery, thus delaying the proceedings.  (Op., 9-10).  The court acted properly within a state-law context and if they had not, it would be irrelevant.  Petitioner's argument that his rights were violated because he was not tried within 180 days as required by Rule 6.004(D) of the Michigan Court Rules fails to state grounds for habeas relief.  "Federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. at

67-68; *see Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) (violation of state speedy trial rule not a ground for habeas relief).

    E.  <u>Error in Evidentiary Ruling</u>

    Petitioner also claims the trial court erred in admitting into evidence the autopsy photos of Kathryn Dyer.  This evidence was admitted during the testimony of Dr. Stephen Cohle, the expert forensic pathologist who examined Dyer's remains.  (TT II, 44).  Petitioner alleges that the evidence was more prejudicial than probative.  The state Court of Appeals specifically addressed the question of whether the five color pictures of the decedent were properly admitted into evidence.  The court found that the photographs were relevant both to proving that Dyer's death was a homicide and to petitioner's intent, and that their probative value was not substantially outweighed by the danger of unfair prejudice.  (Op., 12).

    To justify habeas corpus relief, petitioner would be required to show that this holding of the state Court of Appeals was contrary to, or represented an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  The Supreme Court has never articulated a clearly established federal standard for the admission of forensic photographs.  To the contrary, the Court generally holds that matters involving the introduction of evidence are governed by state law and cannot justify habeas corpus relief.  *See Estelle*, 502 U.S. at 67-68; *accord Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) ("The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.").  Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and therefore warrant habeas corpus relief.  *See*

-34-

*Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  The Court of Appeals has held that admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial.  *See Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (holding that gruesome photographs of decedent do not raise the "spectre of fundamental fairness such as to violate federal due process of law.");  *accord Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004).  Furthermore, it is not prosecutorial misconduct for a prosecutor to present evidence in reliance on the trial court's ruling in favor of admissibility.  *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008).  As the photos of the victim's body were clearly relevant to reveal the intent to kill, a necessary element of the murder charge, the trial judge's decision to admit them is constitutionally unassailable, and the prosecutor's offering of such relevant evidence cannot be deemed misconduct. The decision of the state court on this claim does not present an unreasonable application of clearly established federal law as determined by the Supreme Court, nor was it an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

### F.   Denial of Right to Present a Defense

Petitioner next takes issue with the court's failure to grant an adjournment to accommodate an out-of-state witness during pretrial motions.   (docket # 31, Motions, 119). Specifically, petitioner wished to produce Rodney Cobb (a/k/a Rodney Stork).  The trial court concluded that, absent a showing as to the substance of Cobb's testimony (*Id*. at 120-21), there was no basis to grant an adjournment.  The court believed that evidence suggested Cobb could testify only that he was working in Texas at the time of the murder, a fact the prosecution did not contest, and not to any substantial element of the murder itself.  (*Id*.).  The state Court of Appeals held that

the trial court did not abuse its discretion, as, admitting he himself could not declare with any certainty how Cobb would testify, petitioner failed to establish prejudice. (Op., 13). Petitioner, in including this issue in his appeal for habeas corpus, continues to admit that the substance of Cobb's testimony is unknown, that "it is just unknown what he would say." (Petitioner's Brief, docket # 2, ID # 90).

To the extent Petitioner contends that he was deprived of his right to present a defense, his claim is meritless. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 58, 56 (1987)). The validity of a trial court's decision to deny a motion for an adjournment is measured by a totality of the circumstance test, but is otherwise accorded great deference. *Forensic v. Birkett*, 501 F.3d 469, 479 (6th Cir. 2007). *Forensic* held that "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). The relevant

question framed by *Ferensic* was "whether the state courts considered the relevant circumstances." 501 F.3d at 479.

Here it is clear that the trial court carefully weighed the issue before making a decision. This included listening to lengthy arguments and the examination of Detective Joe Patino, the only man to have any actual contact with Rodney Cobb. (Motions, 114). The court took into consideration the fact that petitioner had no knowledge as to the testimony Cobb would provide, and that it was probable Cobb would simply assert his Fifth Amendment right, considering his involvement in the crime. (*Id*. at 119-20). The court observed that a week remained before trial and that petitioner was free to attempt to find Cobb and produce testimony via telephone. (*Id*. 120). The court did not ignore the relevant circumstances surrounding the case, but rather rendered an informed decision after suitable deliberation. *Ferensic v. Birkett*, 501 F.3d at 479. As petitioner still has no knowledge of if, or how long, it might have taken to find Cobb, or what, if anything, Cobb would say that might have altered the result at trial, petitioner has done nothing to establish that the court's actions were arbitrary or disproportionate to the purposes they were designed to serve. *United States v. Scheffer*, 523 U.S. at 308. Petitioner's claim amounts to an attempt to undermine the court's discretion based on conjecture, and is patently meritless.

G.    <u>Failure to Grant a Directed Verdict or New Trial</u>

Petitioner alleges the trial court erred in failing to grant his motions for a directed verdict or a new trial. This claim is identical to petitioner's challenge to the sufficiency of the evidence, addressed in Section I. above.

H.    Failure to Take Independent Action Regarding Prosecutorial Misconduct

Petitioner finishes his list of grievances in claim III with the contention that the trial court erred by failing to take independent action against the prosecution's alleged misconducts enumerated in claim VI. As addressed below, there was no prosecutorial misconduct. This misplaced outgrowth of that claim is therefore without merit.

## IV.    Ineffective Assistance of Counsel

Petitioner's next claim is that he was denied effective assistance of counsel. Petitioner specifically predicates this claim upon two perceived failures on the part of appointed counsel: the failure to object to certain "statements and trial situations" petitioner believes prejudiced him; and an alleged failure to call two witnesses, Joyce Mangus and Tonya Totten, to the stand for the purpose of impeaching the testimony of prosecutorial witness Kyle Chapman.

Petitioner's claim of ineffective assistance of counsel is meritless. Such claims are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington*, 466 U.S. at 687-88. In adjudicating the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* The Sixth Amendment is violated only if counsel's acts or omissions

-38-

"were outside the wide range of professionally competent assistance." *Id.*  Strategic choices after

thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable."

*Id*. at 690.  To prevail on the second prong, petitioner must demonstrate a "reasonable probability"

that the result of the trial would have been different but for counsel's errors.  *Id.* at 694.  To

demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*  at 694;

*see Premo v. Moore*, 131 S. Ct. at 739.

              Because the state circuit court and Court of Appeals directly addressed petitioner's

claims of ineffective assistance of trial counsel, their decision must be afforded deference under

AEDPA.  *Premo v. Moore*, 131 S. Ct. at 740.  To receive habeas relief, petitioner must demonstrate

that the state court's decision was contrary to, or represented an unreasonable application of,

*Strickland v. Washington*.  *See Harrington v. Richter*, 131 S. Ct. at 786-86; *Bell v. Cone*, 535 U.S.

at 698-99.  Hence, it is not enough to convince the federal habeas court that, in its independent

judgment, the state-court decision applied *Strickland* incorrectly.  Rather, petitioner must show that

the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."

*Bell v. Cone*, 535 U.S. at 699.  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*,

443 F.3d 517, 525 (6th Cir. 2006).  "[B]ecause the *Strickland* standard is a general standard, a state

court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

*Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).  Recent Supreme Court decisions describe

this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the

§ 2254(d)(1) standard."  *Knowles v. Mirzayance*, 129 S. Ct. at  1420; *see Premo v. Moore*, 131 S.

Ct. at 740; *Harrington v. Richter*, 131 S. Ct. at 788.  Furthermore, the findings of historical fact made by the state courts are presumed to be correct, in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

A.     Failure to Call Witnesses

Petitioner does not begin to satisfy the demanding *Strickland* standard.  As the Michigan Court of Appeals observed, Joyce Mangus was called to the stand as a witness for the prosecution, and could have answered questions regarding any statements Kyle Chapman made to her at that time.  Moreover, Kyle Chapman was directly questioned on the matter of the supposed statements, and denied making them.  (TT IV, 92).   Kyle Chapman was also asked at trial whether he threatened to kill Tonya Totten "like I did the old lady," and he denied this as well.  (*Id*. at 97). Thus the jury was made aware of both the alleged confession of perjury to Mangus and the alleged incriminating threat to Totten.  The decision not to press Mangus on the stand or to recall her as a witness for the defense, or to call Totten at all, constitute strategic decisions on the part of defense counsel and are therefore unchallengeable.  *Strickland v. Washington*, 466 U.S. at 687-88.

Petitioner has not only failed to prove deficiency in his counsel's assistance, he has also failed to prove any potential deficiency impacted the outcome.  Petitioner has provided no evidence as to the substance of either witnesses' testimony.   With nothing more than an unsubstantiated assurance that Kyle Chapman's testimony would have been called into question, petitioner falls well short of proving prejudice as well as a deficiency.

B.      Failure to Raise Objections

Petitioner's alternate basis for his claim of ineffective assistance of counsel arises from counsel's failure to:

> [O]bject to the issues raised in this brief or raise other arguments as are
> argued in this and other questions presented (those arguments are incorporated
> herein.)

(Brief, docket # 2, ID # 98).

Petitioner simplifies this claim to the still ambiguous allegation that his counsel violated the *Strickland* standard by his failure to "object to trial statements and situations which are prejudicial." (Brief, docket # 2, ID # 98). Presumably petitioner refers to counsel's failure to object to the instructions for certain felony charges, which led to a failure to preserve those claims on appeal, and to the failure to object to the alleged acts of prosecutorial misconduct. Petitioner's brief fails to raise any viable federal precedent.

Petitioner's largely unarticulated claim falls well short of meeting the demanding *Strickland* standard. As noted above, an objection to jury instructions regarding the charges of larceny in a building and second-degree home invasion would be futile, as petitioner received adequate notice of these charges. Failure to object to the prosecution's statements which, petitioner insists, argued facts not in evidence, would have been equally pointless. As noted in section VI below, the state court correctly concluded that the prosecutor did not engage in misconduct. Counsel's failure to make futile objections may be viewed as a strategic decision meant to preserve his credibility, and thus cannot be challenged. *Strickland v. Washington*, 466 U.S. at 690. Nor could

-41-

the failure to raise futile objections have prejudiced the defendant, as the result would likely have been the same even if they were voiced and overruled. *Id.* at 694.

V.    **Denial of New Trial on Basis of Newly Discovered Evidence**

In his fifth claim, petitioner asserts that the trial court abused its discretion when it denied his motion for a new trial based on newly discovered evidence. The evidence at issue was a 2002 police report in a different case, involving the homicide of Henry Marrot. When interviewed, Wayne Scott Forester claimed that his cousin, Kyle Chapman, admitted that he lied about petitioner's involvement in a murder to get out of jail. (docket # 2-9, ID # 277). In his motion for a new trial and on direct appeal, petitioner asserted this was newly discovered evidence that Kyle Chapman committed perjury, and that there was a reasonable probability that this newly discovered evidence was sufficient to undermine confidence in the trial's outcome.

The state appellate court was not persuaded by petitioner's arguments. Rather, the court concluded that Forrester's police statement, made in 2002, did not qualify as newly discovered evidence, as it existed at the time of trial in 2005 and could have been uncovered then by the exercise of reasonable diligence. (Op., 11). The court also concluded that the new evidence likely would not have altered the outcome of the trial. (*Id.*). The court finally held that the purpose of this evidence, even if it constituted newly discovered evidence, was merely to impeach Chapman and was therefore cumulative in nature, and not sufficient grounds for a retrial. (*Id.* at 11-12).

Petitioner now claims that, because this statement pertained to a case "in the same county" as petitioner's own, the prosecution must have been aware of the existence of this statement; that the prosecution could have withheld knowledge of its existence from petitioner; and that the

-42-

evidence could therefore, under Mich. Ct. R. 6.201(B)(2), be considered newly discovered. (Reply Brief, docket # 13, ID # 364). Petitioner also claims that this statement, combined with available statements made by Joyce Mangus and Tonya Totten, was sufficient to prove the prosecution knew that Kyle Chapman was committing perjury, and that the evidence would likely have produced an acquittal. (*Id*.). The basis of petitioner's claim is Mich. Ct. R 6.201(B)(2), a state-court rule allowing the grant of new trials on the basis of newly discovered evidence, and cases decided under that rule. (Brief, docket # 2, ID# 103-07).[3]

When a petitioner files a motion for a new trial prior to filing a direct appeal, the denial of that motion constitutes a part of the original criminal proceedings and habeas relief is available for constitutional errors. *Pudelski v. Wilson*, 576 F.3d 595, 610 (6th. Cir. 2009). As petitioner sought a new trial during direct review, this claim must be decided upon the merits. *Id.* As the *Pudelski* court noted, a habeas petitioner's initial burden under AEDPA is to establish that the state court's decision on an issue is contrary to or an unreasonable application of federal law as established by the Supreme Court. 576 F.3d at 610-11. The grant or denial of new trials based on new evidence is essentially a state-law concern; the Supreme Court has never enunciated rules of constitutional magnitude in this area. *Id.* at 611. "The Constitution itself, of course, makes no mention of new trials." *Herrera v. Collins*, 506 U.S. 390, 408 (1993). In these circumstances, the denial of a motion for a new trial is reviewable in habeas corpus only for a due-process violation. *Pudelski*, 516 F.3d at 611.

---

[3] Petitioner has not alleged a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), nor did he assert a *Brady* claim in the state courts. His only claim is that he should have been given a new trial.

To prevail on the merits, petitioner must establish that the trial court's denial of his motion for new trial based on newly discovered evidence was "so egregious" that it violated his right to a fundamentally fair trial. *Pudelski*. 516 F.3d at 611 (citing *Fleming v. Metrish*, 556 F.3d 520, 535 (6th Cir. 2009); *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)).  A petitioner does not meet this test if a reasonable jury could still have found him guilty, even had the "new" evidence been admitted. *Pudelski*, 371 F.3d at 612.  In the present case, the new evidence was in some respects exculpatory and might have served to impeach Kyle Chapman's testimony, but it would have been largely cumulative in nature, as issues of Chapman's credibility were already raised before and considered by the jurors.  (TT IV, 92, 97).  Of considerable importance, Chapman's testimony did not directly implicate petitioner in the murder.  Rather, Chapman testified as to petitioner's involvement in the efforts to destroy the victim's car.  Chapman, in fact, denied knowing the car's origins and believed petitioner and his associates were guilty of nothing more than car theft. (*Id*. at 93, 99).  There existed ample evidence for a reasonable juror to connect petitioner to Dyer's car and its subsequent destruction without Chapman's testimony.  In short, Chapman did not directly implicate petitioner in the murder, his testimony was cumulative to other evidence linking petitioner to the crime, and his credibility was subjected to heavy attack already by the defense.

Petitioner has failed in his burden to establish that, had Forester's statement been presented at trial, it would have altered the result. *Pudelski*, 567 F.3d at 612.  The trial court did not abuse its discretion or misapply Michigan law in denying petitioner's motion for a new trial, nor did the state Court of Appeals fail to apply any clearly established federal principle in affirming the trial court's decision.  Petitioner has not been denied a fundamentally fair trial or suffered a violation of his right to due process of law.  Petitioner is not entitled to habeas relief on this claim.

-44-

## VI.   Prosecutorial Misconduct

In his final claim, petitioner alleges a violation of his right to a fair trial arising from prosecutorial misconduct.  Specifically, petitioner alleges that the prosecutor made improper remarks in his opening statement for the purposes of eliciting the sympathy of the jury, and by repeatedly introducing evidence petitioner considered prejudicial rather than probative.  These supposed acts of misconduct were not objected to at trial, and so would rightfully be open to procedural default, as described above.  However, as this claim is meritless, procedural default need not be considered.

Questions pertaining to the proper admission of evidence and the content of opening and closing statements are matters of state law, and raise no questions of general federal rights. Consequently, to be considered as grounds for habeas relief, the challenged conduct of the prosecutor must be so egregious as to create a due-process violation.  The scope of review in a habeas corpus action of prosecutorial misconduct is narrow.  "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials." *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.*  "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181.  "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) (quoting *Smith*

*v. Phillips*, 455 U.S. 209, 219 (1982)).   Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair.  *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

The first question for the habeas court is whether the prosecutor's statement was misconduct at all.  *West v. Bell*, 550 F.3d at 566.  If so, the court is to examine four factors in determining whether the impropriety was "flagrant":  (1) the likelihood that the remarks would mislead the jury or prejudice the accused' (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether other evidence against the defendant was substantial.  *Id.*; *see Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).  A petitioner must do more than show erroneous conduct.  "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)).  Under AEDPA, this bar is heightened by the deference that the court must accord state-court rulings.  *Bowling v. Parker*, 344 F.3d 487, 513 (6th Cir. 2003).

In an effort to show misconduct, petitioner concatenates unobjected-to comments made in opening statement, which petitioner argues were unfairly prejudicial.

> The prosecutor did this by stating: that this murder had left three people without their mother, (TT I, p 126); that the victim's son would probably have this in his memory forever, (finding his mother on the floor with blood around her head), (TT I, p 129); description of details of the Church service which emphasized the mother's religion activity in her Church by giving a talk and implying "goodness" (TT I, pp 137-138).

(Brief, docket # 2, ID # 111).

-46-

Petitioner also objects to statements made in prosecution's closing statement, which he contests argued facts not in evidence.

> The "facts argued" were: that the strangling was likely second, (TT V, p 10); that most witnesses read the paper, (TT V, p 10); that the DNA transferred to the victim's hands while she was singing and holding hands in Church, (TT V, p 13); that she was holding hands with a male on each side while at Church, (TT V, p 13); that the Petitioner said he went there to rob the victim, (TT V, p 14); that the sketch was a "dead ringer" for the petitioner, (TT V, p 16); That there were seven people to whom the Defendant admitted to having a part in killing the victim, (TT V, P 17); that the petitioner asked Crater to be an alibi for him, (TT V, p 21).

(Brief, docket # 2, ID # 113).

The Michigan Court of Appeals held that a review of the record as a whole showed "the remarks had their basis in the evidence on record and rational inferences thereof, and were permissible commentary in evidence." (Op., 14). The court perceived no appeal to sympathy for the victim. (*Id.*). While the prosecutor did not confine himself to the blandest possible presentation of his case, he was not obliged to. *See U.S. v. Boyd,* 640 F.3d 657, 670-71 (6th Cir. 2011); *Byrd v. Collins*, 209 F.3d at 532. Nothing prevents the prosecutor from "appealing to the jurors' sense of justice, or from connecting the point to the victims in the case." *Bedford v. Collins,* 567 F.3d 225, 234 (6th Cir. 2009). The determination that the prosecutor's comments were not improper was therefore reasonable. Even assuming the findings of the state appellate court on the propriety of the statements were not entitled to substantial deference, the prosecutor's comments cannot be deemed flagrant. It is difficult to imagine how the prosecution's mildly impassioned rhetoric could constitute so egregious an error as to make the trial so unfair as to result in the denial of due process. *Darden v. Wainwright*, 477 U.S. at 181.

Moreover, with regard to the facts allegedly argued without evidence, the state court found that the reverse was actually the case.  (Op., 14).  This finding is entitled to a presumption of correctness, 28 U.S.C. § 2254(e), and it is supported by an independent review of the record.  The evidence against petitioner was considerable and the allegedly offending arguments by the prosecutor were isolated.  The purported violations were insubstantial and did not infect the fairness of the proceedings.  *Darden v. Wainwright*, 477 U.S. at 181.  The state court acted reasonably in this matter, and petitioner's claim provides no grounds for habeas relief.

In summary, the decision of the Michigan Court of Appeals rejecting all petitioner's prosecutorial misconduct claims was not an unreasonable application of clearly established federal law as determined by the Supreme Court, nor was it an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

### Recommended Disposition

For the foregoing reasons, I recommend that the petition be denied.

Dated:   August 8, 2011                    /s/  Joseph G. Scoville
                                           United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General

objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).